RYAN C. WOOTEN (TX SBN 24075308)
(admitted *pro hac vice*)
rwooten@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
609 Main Street, 40th Floor
Houston, Texas 77002
Telephone: (713) 658-6400

JAMES MCQUADE (NY SBN 2753077)
(admitted *pro hac vice*)
jmcquade@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5198

KATIE E. BRISCOE (CA SBN 287629)
(admitted *pro hac vice*)
kbriscoe@orrick.com
FRANK N. ZALOM (CA SBN 315930)
(admitted *pro hac vice*)
fzalom@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, California 95814
Telephone: (916) 447-9200

LIESEL STEVENS (UT SBN 10431)
RAY QUINNEY & NEBEKER P.C.
lstevens@rqn.com
36 South State Street, Suite 1400
Salt Lake City, Utah 84111
Telephone: (801) 323-3304

*Attorneys for Plaintiff*
*Kiva United Energy, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KIVA UNITED ENERGY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>FLASHPOINT ENERGY PARTNERS, LLC and BRANNON MORSE,<br><br>Defendants. | **PLAINTIFF KIVA UNITED ENERGY, INC.'S OPPOSITION TO DEFENDANT BRANNON MORSE'S MOTION FOR SUMMARY JUDGMENT AND TO STAY DISCOVERY**<br><br>**[HEARING REQUESTED]**<br><br>Case No. 2:24-cv-00250-TC-DBP<br><br>The Honorable Judge Tena Campbell<br><br>Chief Magistrate Judge Dustin B. Pead |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1
II. RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS .......... 2
III. STATEMENT OF ADDITIONAL MATERIAL FACTS .......... 13
A. Kiva's Trade Secrets .......... 13
B. Morse's Employment with Kiva and Knowledge of Kiva's Trade Secrets and Confidential Information .......... 15
C. Morse's Confidentiality and Non-Compete Agreement with Kiva .......... 17
D. Morse's Recruitment by Flashpoint and Departure from Kiva .......... 17
E. Morse's Use of Kiva's Confidential and Trade Secret Information to Solicit Kiva's Customers .......... 18
F. Morse's and Flashpoint's Litigation Delay Tactics .......... 19
G. This Motion and Morse and Flashpoint's Subsequent Refusals to Produce Texts, Emails, and Witnesses for Deposition .......... 21
H. Morse's and Flashpoint's Improperly Withheld Discovery Will Show That Morse Used Kiva's Trade Secrets to Solicit Kiva Customers for Flashpoint .......... 21
IV. LEGAL STANDARD .......... 22
V. ARGUMENT .......... 23
A. Rule 56(d) Requires Denying Summary Judgment Because Morse and Flashpoint Refuse to Produce Key Discovery and Deposition Witnesses .......... 23
B. Summary Judgment on Kiva's Breach of Contract Claim Must Be Denied .......... 25
1. Kiva Always Employed Morse—Even After the 2022 Merger .......... 25
2. Morse's 2022 Promotion Letter Does Not Supersede His Confidentiality Agreement with Kiva .......... 26
3. Morse's 2022 Promotion Letter Does Not Incorporate the Confidentiality Agreement—Nor Does It Need to for the Confidentiality Agreement to Control .......... 27
C. Summary Judgment on Kiva's Trade Secret Claims Must Be Denied .......... 28
1. Kiva's Confidential Customer Knowledge and Profitability Information Are Trade Secrets .......... 29
a) Kiva's Confidential Customer Knowledge and Profitability Information Are Not Known Outside the Business and Could Not Be Easily Duplicated .......... 30
b) Kiva's Confidential Customer Knowledge and Profitability Information Are Valuable to Kiva and Its Competitors .......... 30
c) Kiva Has Spent Decades and Millions of Dollars Developing Its Confidential Customer Knowledge and Profitability Information .......... 31

d) Kiva Protects Its Confidential Customer Knowledge and Profitability Information ........ 32

e) Numerous Courts in the Tenth Circuit Have Held That the Types of Information Kiva Seeks to Protect Are Trade Secrets ........ 33

2. Morse Acquired Kiva's Customer Knowledge and Profitability Information Through His Employment at Kiva and Took It When He Left ........ 34

3. Morse Knowingly and Unlawfully Used Kiva's Trade Secrets to Benefit Flashpoint and Himself ........ 35

4. The Doctrine of Inevitable Disclosure Applies Here ........ 36

D. Discovery Should Not Be Stayed ........ 36

VI. CONCLUSION ........ 38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adamson v. Multi Cmty. Diversified Servs., Inc.*,
514 F.3d 1136 (10th Cir. 2008) ....................22

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................22

*Applied Predictive Techs., Inc. v. Marketdial*,
No. 219CV00496JNPCMR, 2020 WL 6940736 (D. Utah Nov. 25, 2020) ....................29

*Bimbo Bakeries USA, Inc. v. Sycamore*,
29 F.4th 630 (10th Cir. 2022) ....................29, 30, 31, 32

*Burke v. Utah Transit Auth.*,
462 F.3d 1253 (10th Cir. 2006) ....................23

*Burlington N. & Santa Fe Ry. Co. v. Grant*,
505 F.3d 1013 (10th Cir. 2007) ....................22

*Calence, LLC v. Dimension Data Holdings*,
No. C06-0262RSM, 2007 WL 1526349 (W.D. Wash. May 23, 2007) ....................34

*Classic Aviation Hldgs LLC v. Harrower*,
No. 220CV00824RJSJCB, 2021 WL 633587 (D. Utah Feb. 18, 2021) ....................37

*Edwards Lifesciences LLC v. Thompson*,
No. 24-CV-02558-RMR-KAS, 2025 WL 2045423 (D. Colo. June 18, 2025)....................34

*Hammerton, Inc. v. Heisterman*,
No. 2:06-CV-00806 TS, 2008 WL 2004327 (D. Utah May 9, 2008)....................33

*Hanks v. Anderson*,
No. 2:19-CV-00999-DBB-JCB, 2024 WL 4092949 (D. Utah Sept. 5, 2024).......29, 30, 31, 32

*Harry L. Young & Sons v. Ashton*,
538 P.2d 316 (Utah 1975)....................26

*Hertz v. Luzenac Grp.*,
576 F.3d 1103 (10th Cir. 2009) ....................33

*Hous. Auth. of Cnty. of Salt Lake v. Snyder*,
2002 UT 28, 44 P.3d 724....................27

*InnoSys, Inc. v. Mercer*,
2015 UT 80, 364 P.3d 1013 .......................................................................................33

*Jensen v. W. Jordan City*,
968 F.3d 1187 (10th Cir. 2020) ...............................................................................27

*Rost ex rel. K.C. v. Steamboat Springs RE-2 School Dist.*,
511 F.3d 1114 (10th Cir. 2008) ...............................................................................22

*MSC Safety Sols., LLC v. Trivent Safety Consulting, LLC*,
No. 19-CV-00938-MEH, 2019 WL 5189004 (D. Colo. Oct. 15, 2019)..................................32

*Novell Inc. v. Timpanogos Rsch. Grp. Inc.*,
No. 970400339, 1998 WL 177721 (Utah Dist. Ct. Jan. 30, 1998) ..........................................36

*One Call Locators, Ltd. v. CenturyTel Serv. Grp., LLC*,
No. 16-CV-00844-CMA-KMT, 2017 WL 6017223 (D. Colo. Dec. 5, 2017).........................27

*Patton v. General Signal Corp.*,
984 F. Supp. 666 (W.D.N.Y. 1997)..........................................................................23

*Price ex rel. Price v. W. Res., Inc.*,
232 F.3d 779 (10th Cir. 2000) ................................................................................23

*Quest Sol., Inc. v. RedLPR, LLC*,
No. 2:19-CV-437-CW-DBP, 2021 WL 1688644 (D. Utah Apr. 28, 2021).............................37

*Schutz v. Thorne*,
415 F.3d 1128 (10th Cir. 2005) ...............................................................................22

*SCO Grp., Inc. v. Novell, Inc.*,
578 F.3d 1201 (10th Cir. 2009) ...............................................................................23

*Stamper v. Johnson*,
2010 UT 26, 232 P.3d 514 .......................................................................................26

*Surgenex, LLC v. Predictive Therapeutics, LLC*,
462 F. Supp. 3d 1160 (D. Utah 2020)......................................................................37

*Sw. Stainless, LP v. Sappington*,
582 F.3d 1176 (10th Cir. 2009) ...............................................................................33

*Total Quality Sys., Inc. v. Universal Synaptics Corp.*,
679 F. Supp. 3d 1196 (D. Utah 2023)..................................................................28, 29

*Trugreen Companies, L.L.C. v. Scotts Lawn Serv.*,
508 F. Supp. 2d 937 (D. Utah 2007)..............................................................26, 27, 28

*Truman v. Johnson*,
No. 2:17-CV-775-DAK-CMR, 2024 WL 3359467 (D. Utah July 8, 2024)............7, 11, 12, 23

*USA Power, LLC v. PacifiCorp*,
2016 UT 20, 372 P.3d 629.........................................................................................33, 37

*Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*,
616 F.3d 1086 (10th Cir. 2010) ..........................................................................23, 24

*Wisk Aero LLC v. Archer Aviation Inc.*,
No. 3:21-CV-02450-WHO, 2021 WL 8820180 (N.D. Cal. Aug. 24, 2021) ..........................34

**Statutes and Rules**

18 U.S.C. § 1836..............................................................................................................28

Defend Trade Secrets Act ........................................................................................ *passim*

Fed. R. Civ. P. 30(b)(6)........................................................................................4, 24, 25

Fed. R. Civ. P. 56(d) ............................................................................................... *passim*

Local Rule 7-1(a)(8) .........................................................................................................21

Utah Code Ann. § 13-24-1.................................................................................................29

Utah Post-Employment Restrictions Act of 2016..............................................................28

Utah Uniform Trade Secrets Act ............................................................................. *passim*

## I. INTRODUCTION

Defendant Brannon Morse's Motion for Summary Judgment and to Stay Discovery is a meritless delay tactic that should be denied.

Morse filed this Motion on the day that he and Defendant Flashpoint Energy Partners, LLC committed to produce text messages and emails between Morse and Plaintiff Kiva United Energy, Inc.'s customers—customers to whom Morse admitted in his interrogatory responses to soliciting on Flashpoint's behalf. Kiva believes that those text messages and emails will be detrimental to Morse and Flashpoint's defenses and will support Kiva's claims. Kiva further believes that improper purpose motivated this Motion, as evidenced by Flashpoint's request to join it via a joinder seven days later, which the court denied, and as evidenced by Morse and Flashpoint's subsequent refusal to produce the aforementioned communications and appear for depositions until *after* the Court rules on this Motion. Morse and Flashpoint's refusal to produce the aforementioned text messages and emails and refusal to appear for depositions deprives Kiva of key testimony and evidence that it needs to oppose this Motion. For that reason alone, this Motion should be denied pursuant to Rule 56(d).

But even based solely on the evidence that Kiva has collected on its own and subpoenaed from third parties, and the limited evidence that Morse and Flashpoint have produced to date, summary judgment must also be denied on the merits. As detailed herein, Kiva has presented evidence showing that Morse entered an enforceable agreement with Kiva in 2010 to protect Kiva's confidential information, to refrain from soliciting Kiva's customers, and to refrain from competing against Kiva for two years after his employment ended. Kiva has further presented evidence that Morse breached his agreement with Kiva by soliciting at least 77 Kiva customers and selling over 25,171,487 gallons of propane to at least 40 of them in the course of his subsequent employment with Flashpoint. Kiva has also presented evidence showing that its confidential

customer knowledge and profitability information are trade secrets protected by the Defend Trade Secrets Act of 2016 and Utah Uniform Trade Secrets Act, and that Morse and Flashpoint misappropriated Kiva's trade secrets and used them to solicit Kiva's customers on Flashpoint's behalf within days of leaving Kiva.

For these reasons and more as detailed herein, Kiva requests that this Court deny Morse's Motion in its entirety.

## II. RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

3. Mr. Morse's job as a salesperson for Kiva was to sell propane. Morse Declaration, attached as Exhibit 1. In that role, he knew Kiva's pricing but was not very familiar with its profit margins. *Id.* The pricing and margins changed constantly, with supply and demand. *Id.*

**Kiva's Response:** Undisputed that Morse's job for Kiva was to sell propane, but for completeness his job was also to maintain and develop Kiva's knowledge of and relationships with current customers, and to develop Kiva's knowledge of and relationships with new customers. App'x of Exs. In Sup. of Kiva's Oppo. to Morse's Mot. for Sum. Jgmt and to Stay Disc. ("App'x"), Ex. 2 (Declaration of Angie Hasenohrl ("Hasenohrl Decl.") ¶ 17). Kiva disputes that Morse was "not very familiar with [Kiva's] profit margins." As a territory manager and regional sales manager, Morse had a monthly profit margin goal. *Id.* ¶ 18. He, like all other territory managers, tracked his margins on deals throughout the month to ensure he was on track to meet his margin goal. *Id.* Morse at times also negotiated his own supply deals and freight rates. *Id.* Morse had to track profit margins to ensure that his deals were profitable and used excel spreadsheets to assist him in doing so. *Id.*; App'x Ex. 1 (Declaration of James McQuade ("McQuade Decl."), ¶ 9, Ex. I). After Kiva Promoted Morse to Sales Director in November 2022, Morse worked with Hasenohrl and territory managers to set their monthly profit margin goals, and regularly received email reports showing Kiva's profit margins on specific transactions and on a month-by-month and year-

by-year basis in each of Kiva's territories. App'x Ex. 2 (Hasenohrl Decl. ¶ 18, Exs. D-E). Kiva disputes that "pricing and margins changed constantly, with supply and demand" and objects to the statement as vague, ambiguous, and overbroad. Pricing and margins fluctuated significantly at times, and at other times they did not. *Id.* ¶ 13. Additionally, while supply and demand were factors that could affect pricing and margins, they did not always do so and were not the only factors that did so. *Id.* For example, some customers had fixed-price contracts and Kiva hedged them such that their price and margins did not fluctuate. *Id.* Some customers were not very price sensitive due to their loyalty to Kiva or lack of alternative available suppliers, so Kiva was able to maintain consistent margins with them. *Id.* Kiva's supply strategies also allowed it to maintain or expand its margins in the face of tighter supply and greater demand, for example, by purchasing propane more cheaply in the summer and storing it for use in the winter, and purchasing propane in regions where it was cheaper and in less demand and shipping it to areas where it was in greater demand. *Id.* Morse was knowledgeable on all of these strategies. *Id.*

4. Because propane is a commodity, no company in the industry has a secret formula that makes its product better than any other. *Id.*

**Kiva's Response:** Kiva objects to this statement as speculation and lacking foundation, and Kiva disputes it. Propane wholesalers like Kiva and Flashpoint do more than sell a commodity. They sell a service—the reliable and consistent supply and delivery of propane to customers when they want it and how they want it. App'x Ex. 2 (Hasenohrl Decl. ¶ 5). Doing this effectively and profitably requires customers to sell propane to, and requires knowledge of those customer's preferences. For example Kiva has developed and maintains a confidential customer list and confidential knowledge of its customers' preferences regarding: (1) method, frequency, and time of communication; (2) time, method, and location of deliveries; (3) types of sales and contracts,

such as market price, fixed price, fixed price with flexibility, tank lease, and automatic tank monitoring; and (4) customers' future plans that may affect their future propane purchases. *Id.* ¶¶ 5, 9. This knowledge allows Kiva to forecast what its customers want and allows Kiva to give them the highest level of service so that they remain loyal to Kiva. *Id.* Kiva's confidential customer knowledge also includes knowledge of customer historical purchase patterns, such as times of year when they demand more and less propane, and knowledge of customer price sensitivity, which allows Kiva to forecast the demands on its propane supply and engage in strategic supply strategies to optimize its pricing and margins to maximize its profitability and value to its customers. *Id.* These supply strategies include hedging to mitigate the risk of increased future supply costs, transporting propane from markets where propane is cheaper to markets where it is more expensive, and purchasing propane during times when it is cheaper and storing it to sell later when it is more expensive. *Id.*

5. While Mr. Morse worked for Kiva, the company did not offer any products or services that were any different than any other wholesaler. *Id.*

**Kiva's Response:** Kiva objects to this statement as speculation and lacking foundation, and Kiva disputes it. Kiva offers tank leasing agreements whereby it provides bulk propane tanks to customers with the agreement that Kiva will be the only supplier to fill that tank. App'x Ex. 2 (Hasenohrl Decl. ¶ 6). Kiva also offers tank monitoring programs whereby it monitors the level of a customer's propane tank and automatically refills it when needed. *Id.* Kiva offers fixed-price contracts with a flex option in the event that a customer wants to purchase more or less than the contract calls for. *Id.* Kiva also owns and operates its own trucks and railcars for the delivery and transfer of propane. *Id.* Kiva does not believe that all other propane wholesalers offer these services and anticipates that the Rule 30(b)(6) deposition of Flashpoint's corporate witness will show that

Flashpoint does not offer all of these services. *Id.*

6. The prices offered by all wholesalers in the industry at any given time are generally within $0.01-$0.05 of each other, because prices are based on the cost of local production by refineries and gas plants, plus the cost of freight, and/or weather conditions that affect all the wholesalers equally. *Id.*

**Kiva's Response:** Kiva objects to this statement as speculation and lacking foundation, and Kiva disputes it. The prices of propane sold to customers on fixed-price propane supply contracts are not always based on terminal post prices. App'x Ex. 2 (Hasenohrl Decl. ¶ 8). A propane wholesaler's price is also dependent on the price sensitivity of its customers, which is impacted by the existence of other competitors having knowledge of and soliciting to those customers, and the wholesaler's development and possession of knowledge of its customers' preferences and patterns to deliver high-quality service to them. *Id.* Additionally, propane terminals, where propane is bought and sold at a spot price, are not always co-located with refineries, and in such instances the prices at those propane terminals are not based on "the cost of local production" as Morse suggests. *Id.* Weather conditions also do not affect all wholesalers equally, as wholesalers who are able to forecast their customer demands and effectively store and transport cheaper propane from lower-demand regions are less impacted by weather conditions. *Id.*

7. No wholesaler in the propane industry has any "special sauce." *Id.* Established wholesalers offer the same products and, assuming they have reliable employees and supply, they compete with each other for customers primarily through the tenacity of their salespeople. *Id.*

**Kiva's Response:** Disputed. As noted in Kiva's response to statement of fact No. 4, propane wholesalers sell a service—the reliable and consistent supply and delivery of propane to

customers when they want it and how they want it. App'x Ex. 2 (Hasenohrl Decl. ¶ 5). A wholesaler's confidential knowledge of customers, and its customers' preferences and patterns is "a secret formula" that makes its products better. *Id.* It allows a wholesaler like Kiva to forecast what its customers want and allows Kiva to give them the highest level of service so that they remain loyal to Kiva. *Id.* It also allows Kiva to forecast the demands on its propane supply and engage in strategic supply strategies to optimize its pricing and margins to maximize its profitability and value to its customers. *Id.*

8. Wholesalers generally make $0.03-$0.05 per gallon of propane gas in the summer, and slightly more in the winter when demand is higher. *Id.*

**Kiva's Response:** Kiva objects to this statement as speculation and lacking foundation, and Kiva disputes it. A propane wholesaler's margins are dependent on many factors. They are dependent on the price sensitivity of the wholesaler's customers, which is impacted by the existence of other competitors having knowledge of and soliciting to those customers, and the wholesaler's development and possession of knowledge of its customers' preferences and patterns to deliver high-quality service to them. App'x Ex. 2 (Hasenohrl Decl. ¶ 7). It is also dependent on a wholesaler's ability to forecast customer demand and effectively use supply strategies like hedging, storing, and transporting propane to minimize the costs of the propane it sells. *Id.*

9. The propane industry prints a yearly directory of propane buyers by state, listing the contact information for the representative for each company, that is available to all propane wholesalers. Ex. 2. Thus, every wholesaler in the industry has the full list of all the customers in the industry.

**Kiva's Response:** Kiva objects to this statement as speculation and lacking foundation, and Kiva disputes it. The "propane industry" does not print a yearly directory of propane buyers, and that is not an accurate description of Exhibit 2 to Morse's Motion. *See* ECF No. 89-2 (Morse

MSJ, Ex. 2). The National Propane Gas Association ("NPGA") prints a yearly directory of its members. App'x Ex. 2 (Hasenohrl Decl. ¶ 15). There are many propane purchasers who are not members of the NPGA. *Id.* For example, when comparing Kiva's customer list that it produced in discovery to the NPGA directory that Morse produced, more than half (95 of 187) of Kiva's customers are not listed in the NPGA directory. *Id.*; App'x Ex. 1 (McQuade Decl. ¶ 10, Ex. J). Additionally, comparing the list of Kiva's customers who Morse admitted to soliciting in his Interrogatory responses to the NPGA directory shows that 22 of the 77 Kiva customers who Morse solicited are not listed in the NPGA directory. *Id.* ¶ 11, Ex. K.

10. Propane buyers do not generally enter into exclusive or long-term contracts with suppliers. Ex. 1.

**Kiva's Response:** Kiva objects to this statement for lack of foundation, as speculative, and as vague and ambiguous with respect to the term "generally" and disputes it. As noted in Kiva's response to statement of fact No. 5, Kiva offers tank lease agreements, tank monitoring programs, and fixed-price contracts with a flex option that result in exclusive or long-term contracts with customers. App'x Ex. 2 (Hasenohrl Decl. ¶ 5). Furthermore, Kiva typically experiences low turnover among its customers, even when they do not have a long-term contract in place. *Id.*

11. Mr. Morse enjoyed working for Kiva for many years because he liked his team and the culture of working for a small, privately held company. *Id.*

**Kiva's Response:** Kiva objects to this statement based on FRCP 56(d). *Truman v. Johnson*, No. 2:17-CV-775-DAK-CMR, 2024 WL 3359467, at *1 (D. Utah July 8, 2024) (plaintiff "should have an opportunity to depose [d]efendant prior to summary judgment," as defendant's deposition and documents are "important to [p]laintiff's ability to oppose summary judgment."). Morse has refused to make himself available for deposition in advance of bringing this Motion, unfairly

depriving Kiva the opportunity to test the credibility of this statement. App'x Ex. 1 (McQuade Decl. ¶¶ 2, 7, Ex. G). Flashpoint has also refused to make its witnesses who recruited and hired Morse available, so Kiva cannot confirm what Morse represented to them regarding what he liked about Kiva. *Id.* ¶¶ 2, 7, Ex. H. Because Kiva has not been permitted to take these depositions, it cannot dispute or confirm this statement.

12. Kiva brought this case ostensibly to enforce an undated "Confidentiality and Non-Compete Agreement with Kiva" that Mr. Morse signed "in or about or after July 2009," as part of his promotion into sales. Second Amended Complaint, ECF 57, at 8 (¶ 27); ECF 57-1.

**Kiva's Response:** Kiva objects to this statement's reasons for why Kiva brought this lawsuit as speculation and lacking foundation, and Kiva disputes it. Kiva brought this lawsuit to stop and seek redress for Morse's breaches of his Agreement and to stop and seek redress for Morse and Flashpoint's misappropriation of its trade secrets in violation of the DTSA and UTSA. *See* ECF Nos. 1 & 57. Kiva does not dispute that Morse signed the Agreement in or about or after July 2009, but for completeness, Morse signed the agreement in April 2010 in connection with his April 2010 annual performance review. App'x Ex. 2 (Hasenohrl Decl. ¶ 20, Ex. N).

14. In March 2022, a Canadian company, Superior Plus Corp., acquired the equity interests of Kiva Energy, Inc. *See* Press Release, Ex. 3.

**Kiva's Response:** Undisputed that Superior Plus Corp. purchased Kiva in March 2022, but for completeness and accuracy, prior to Superior Plus Corp. acquiring Kiva, Kiva was a subsidiary of Kamps Propane operating as its own corporate entity with its own employees, assets, and profit and loss statements. App'x Ex. 2 (Hasenohrl Decl. ¶ 23). After the acquisition, Kiva continued to operate as its own corporate entity with its own employees, assets, and profit and loss statements, but it was moved within Superior Plus Corp.'s corporate structure from being a

subsidiary of Kamps Propane to being a sibling entity of Kamps Propane, and both Kiva and Kamps Propane became indirect subsidiaries of Superior Plus Corp., with several corporate entities in between them.[1] *Id.*

15. On November 1, 2022, Mr. Morse began employment with Superior Gas Liquids ("Superior") as the Director of Sales. Ex. 4.

**Kiva's Response:** Disputed. Morse never ceased being an employee of Kiva and never became a Superior employee. Kiva remained Morse's employer for the entire duration of his employment until he left the company in October 2024 to work for Flashpoint. This is evidenced by "Kiva Energy, Inc." remaining the employer of record on Morse's 2023 W2, and by Morse reporting to and being subject to the control of Hasenohrl, Kiva's Vice President of North American Sales and US Operations, who was also a Kiva employee. App'x Ex. 2 (Hasenohrl Decl. ¶ 24, Ex. U). Hasenohrl provided Morse his 2022 promotion letter in connection with his November 1, 2022 promotion to Kiva's Director of Sales after the Kiva-Superior merger, and the use of the Superior offer letter template and references thereto in Morse's promotion letter was simply an administrative error when the letter was drafted. *Id.*, Ex. V. Hasenohrl always represented to Morse that he remained a Kiva employee, Morse always represented himself to customers as a Kiva employee, the signature block on Morse's emails continued to state he was a Kiva employee, Morse's email address continued to have a "kivaunitedenergy.com" domain, and Morse never gave Hasenohrl any indication that he believed he was not a Kiva employee. *Id.*

16. Mr. Morse signed an agreement accepting a new position with Superior on November 2, 2022, which set forth his new title, salary, and bonus structure (the "2022 Agreement"). *Id.* The

[1] The entities in between Kiva and Kamps and Superior Plus Corporation included: Superior Gas Liquids, Services Group, Inc., Superior Plus Energy Services Inc., Superior Plus US Holdings Inc., Superior International Inc., and Superior Plus LP. App'x Ex. 2 (Hasenohrl Decl. ¶ 23).

2022 Agreement provides that Superior's address is in Calgary, Alberta, Canada. The 2022 Agreement did not include a non-compete provision. *Id.* It stated, "All other terms and conditions of your employment will remain unchanged," but did not identify those terms and conditions. *Id.* The 2022 Agreement listed "Conditions of Employment" and "Confidentiality Agreement" as attachments, but Mr. Morse did not receive any attachments to the Agreement. Ex. 1.

**Kiva's Response:** Kiva disputes this statement to the extent that it suggests Morse was hired by Superior as detailed in Kiva's response to Statement No. 15. Kiva does not dispute the remainder of the statement, but for clarity, Morse was not provided the attachments referenced in the 2022 Agreement because the use of the Superior Offer Letter template that includes those references was an administrative mistake, and since Morse was already employed by and continuing to be employed by Kiva, Kiva had no reason to send him conditions of employment or resend him the Confidentiality Agreement.

17. As Director of Sales for Superior, Mr. Morse was no longer doing direct sales; rather, he was managing salespeople. Ex. 1. In this new role, he did not keep up with Superior's pricing or margins. *Id.* He was not privy to or involved with the contracts Superior had with refiners in that role. *Id.*

**Kiva's Response:** Kiva disputes this statement to the extent that it suggests Morse was hired by Superior as detailed in Kiva's response to Statement No. 15. Kiva does not dispute that Morse's primary role as Kiva's director of Sales was managing territory managers, but for completeness and accuracy, that role included requiring Morse to shadow his territory managers on sales trips and to conventions. For example, in April 2023 he went on a multi-day sales trip in California with Kiva Territory Manager Isaac Askeroth, and Askeroth prepared a summary report of it thereafter and sent it to Morse. App'x Ex. 2 (Hasenohrl Decl. ¶¶ 10, 18, Ex. C.) Morse also

stayed in direct contact with many customers via phone, text message, and email. *Id.* ¶ 18. Kiva further disputes that Morse did not keep up with pricing or margins when he was Kiva's Sales Director. A key part of Morse's job as sales director was to make sure that Kiva was making money through its sales. *Id.* Morse worked with Hasenohrl and territory managers to set their monthly profit margin goals, and Morse regularly received email reports showing Kiva's profit margins on specific transactions and on a month-by-month and year-by-year basis in each of Kiva's territories. *Id.* ¶ 11, Exs. D-H. Morse also received reports almost daily that listed all of Kiva's new transactions, the customer, volume sold, and price. *Id.*, Exs. I-K.

18. After Superior took over the company, Mr. Morse no longer enjoyed his job as he had working for Kiva. Ex. 1. The culture changed, some colleagues he enjoyed were gone, all the administration moved to Canada, there were problems with billing customers, and his customers were unhappy with the service and complained to him. Further, he was being criticized for violating protocols that had not been an issue under Kiva. *Id.*

**Kiva's Response:** Kiva objects to this statement as conclusory, lacking foundation, and further objects based on FRCP 56(d). *Supra, Truman v. Johnson*, 2024 WL 3359467, at *1. Morse has refused to make himself available for deposition in advance of this Motion, unfairly depriving Kiva the opportunity to test the credibility of this statement by asking him to specify the nature of and details surrounding the purported criticism he received and purported complaints from customers. App'x Ex. 1 (McQuade Decl. ¶¶ 2, 7, Ex. G). Flashpoint has also refused to make its witnesses who recruited and hired Morse available, so Kiva cannot confirm what Morse represented to them regarding why he was leaving Kiva to work at Flashpoint. *Id.* ¶¶ 2, 7, Ex. H.

19. Mr. Morse left Superior and began working for Flashpoint as a salesperson in October 2023. Ex. 1. Flashpoint is a smaller company with a culture similar to Kiva's before it was acquired

by a much larger company. *Id.*

**Kiva's Response:** Kiva objects to this statement as lacking foundation, and further objects based on FRCP 56(d). *Supra, Truman v. Johnson*, 2024 WL 3359467, at *1. Morse has refused to make himself available for deposition in advance of bringing the Motion, unfairly depriving Kiva the opportunity to test the credibility of this statement by asking him to specify how Kiva's culture has purportedly changed, and how the culture of Flashpoint is different and how it is similar to how Kiva's used to be. App'x Ex. 1 (McQuade Decl. ¶¶ 2, 7, Ex. G). Flashpoint has also refused to make its witnesses available for deposition, so Kiva cannot ask them for information about Flashpoint's culture. *Id.* ¶¶ 2, 7, Ex. H.

20. As an employee of Flashpoint, Mr. Morse has sold propane to some of the customers who have also bought propane from Kiva. *Id.*

**Kiva's Response:** Undisputed. But for completeness and accuracy, Morse admitted in his interrogatory responses to soliciting propane to 77 Kiva customers and to selling 25,171,487 gallons of propane to approximately 40 Kiva customers between October 2023 and February 2025. App'x Ex. 1 (McQuade Decl. ¶ 6, Ex. F).

21. In making sales, Mr. Morse has not used any "trade secrets" of Kiva. *Id.* In fact, he is unaware of any trade secrets that Kiva has. *Id.*

**Kiva's Response:** Kiva objects to this statement based on FRCP 56(d). *Supra, Truman v. Johnson*, 2024 WL 3359467, at *1. Morse has refused to make himself available for deposition in advance of this Motion, unfairly depriving Kiva the opportunity to test the credibility of this statement by asking him how he identified and targeted the Kiva customers he solicited after starting his employment at Flashpoint, how he obtained their contact information, and how he went about communicating with them and soliciting them, what he specifically said to them and what

they said back, how he decided on structuring the sales to them, and how he arrived at the price that he sold to them. App'x Ex. 1 (McQuade Decl. ¶¶ 2, 7, Ex. G). Flashpoint has also refused to make its witnesses available for deposition, depriving Kiva of discovering their knowledge of Morse's recruitment and hire, job duties, and the details of how Morse identified and targeted customers. *Id.* ¶¶ 2, 7, Ex. H. Kiva also disputes this statement. In discovery, Morse produced the contact names and phone numbers for the 77 Kiva customers to whom he admits soliciting. *Id.* ¶ 6, Ex. F. Kiva reasonably believes that he took this contact information from Kiva on his cell phone when he left Kiva and took it with him to Flashpoint. App'x Ex. 2 (Hasenohrl Decl. ¶ 27). Morse also produced text messages from himself to Flashpoint's CEO 10 days after leaving Kiva that show him providing Kiva's confidential information about two of Kiva's customers to Flashpoint. App'x Ex. 1 (McQuade Decl. ¶ 20, Ex. T).

## III. STATEMENT OF ADDITIONAL MATERIAL FACTS

### A. Kiva's Trade Secrets

1. Kiva has spent twenty years and millions of dollars in employee salaries and business expenses developing its confidential and trade secret knowledge of its customers and their patterns and preferences. App'x Ex. 2 (Hasenohrl Decl. ¶ 9). This includes Kiva's customer names, points of contact, addresses, telephone numbers, and email addresses. *Id.* It also includes knowledge of Kiva's customers' preferences regarding: (1) method, frequency, and time of communication; (2) time, method, and location of deliveries; (3) types of sales and contracts, such as market price, fixed price, fixed price with flexibility, tank lease, and automatic tank monitoring; and (4) customers' future plans that may affect their future propane purchases. *Id.* This knowledge allows Kiva to forecast what its customers want and allows Kiva to give them the highest level of service so that they remain loyal to Kiva. *Id.* Kiva's confidential and trade secret customer knowledge also includes knowledge of customer historical purchase patterns, such as times of year when they

demand more and less propane, and knowledge of customer price sensitivity, which allows Kiva to forecast the demands on its propane supply and engage in strategic supply strategies to optimize its pricing and margins to maximize its profitability and value to its customers. *Id.* These supply strategies include hedging to mitigate the risk of increased future supply costs, transporting propane from markets where propane is cheaper to markets where it is more expensive, and purchasing propane during times when it is cheaper and storing it to sell later when it is more expensive. *Id.*

2. Kiva's sales team plays a key role in maintaining and furthering Kiva's confidential and trade secret customer knowledge. Kiva territory managers travel multiple days per month, visiting current and potential customers and taking them to breakfast, lunch, dinner, coffee and events. *Id.* ¶ 10. In between visits, Kiva territory managers call, text, and email customers to keep them engaged. *Id.* Kiva territory managers provide swag and gifts to customers, and sponsor customer events and charities. *Id.* Kiva territory managers also attend and sponsor several national and regional Propane Gas Association meetings and events each year. *Id.* Following these events, Kiva's territory managers prepare confidential trip reports that summarize their interactions with customers and circulate them via email within Kiva's sales team. *Id.*, Exs. A-C. Kiva reimburses its sales team for all expenses they incur in connection with these customer-facing activities, including providing a company car or reimbursing mileage for personal car use, and its annual spend on each territory manager is $60,000-$100,000, in addition to the salaries that Kiva pays team members. *Id.*

3. Kiva carefully and confidentially tracks the profit margins on its sales, its sales volumes to its customers, and the rate at which they pay their outstanding invoices to Kiva. *Id.* ¶ 11, Exs. D-K. This confidential and trade secret information is valuable to Kiva in making future plans

regarding where to expand its operations, where to shrink, and where to focus its resources to maximize profitability and customer value. *Id.* Kiva's confidential and trade secret customer and profitability information is valuable to its competitors. As a preliminary matter, more than half of Kiva's customers (95 of 187) are not members of the NPGA and are not listed in the NPGA annual directory. *Id.* ¶¶ 12, 15; App'x Ex. 1 (McQuade Decl. ¶ 10, Ex. J). Accordingly, without inside knowledge of Kiva's customers, a competitor would need to expend significant time and expense researching, cold-calling, and visiting businesses who may use bulk propane, and even then, some of Kiva's longtime customers would likely only be discovered by physically driving around looking for businesses with bulk propane storage tanks. App'x Ex. 2 (Hasenohrl Decl. ¶ 12). But even if a competitor already had the names and contact information of Kiva's customers, Kiva's customer preference and historical purchase pattern and sales information would still be highly valuable to them because it would allow them to undercut Kiva's prices while still being profitable, take advantage of Kiva's supply strategies, and offer the same level of service and value add to customers as Kiva without having to spend the millions of dollars that Kiva spent developing it. *Id.*

4. Recognizing its value, Kiva protects its confidential and trade secret customer knowledge by requiring its employees to sign confidentiality and non-compete agreements, by storing on the company's password protected servers, and by limiting its distribution within the company to its sales, supply, and accounting teams. *Id.* ¶ 14.

### B. <u>Morse's Employment with Kiva and Knowledge of Kiva's Trade Secrets and Confidential Information</u>

5. Prior to leaving to work for Flashpoint, Kiva was Morse's first and only propane sales job. At Kiva, Morse held the following propane sales positions: Pacific Northwest Sales Territory Manager (2009–2018); California and Pacific Northwest Regional Sales Manager (2018–October

2022); Director of Sales (November 2022–October 2023). *Id.* ¶ 16.

6. In these positions, Morse was entrusted with and regularly accessed Kiva's confidential and trade secret customer knowledge and profitability information. For example, as a territory manager, Morse regularly visited customers on business trips and prepared trip reports. *Id.* ¶¶ 10, 18, Ex. A. Later as Kiva's Sales director, Morse regularly received and commented on trip reports prepared by territory managers, and he accompanied territory managers on business trips. *Id.* ¶ 18, Exs. B-C. As a territory manager, Morse tracked the delivery costs and margins on bids he quoted to customers to ensure that they were profitable, and he used excel spreadsheets to assist him in doing so. *Id.*; App'x Ex. 1 (McQuade Decl. ¶ 9, Ex. I). As Sales Director, Morse regularly received reports showing all of Kiva's sales to each customer, the price per gallon sold, the margin on the sale, and the volume sold, and also received historical reports comparing Kiva's current margins in each territory against prior years. App'x Ex. 2 (Hasenohrl Decl. ¶ 18), Exs. D-K. Morse also received training and updates on Kiva's new offerings, such as a new flex option on Kiva's fixed-price sales that Kiva introduced in 2023. *Id.*, Ex. L, R.

7. Morse was also highly compensated to maintain, develop, and protect Kiva's confidential customer knowledge. In Morse's final year at Kiva, Morse estimated his total Kiva compensation package at $277,401, and with the company's 4% 401k contribution, his compensation exceeded $280,000. App'x Ex. 1 (McQuade Decl. ¶ 12, Ex. L).

8. Kiva also paid for all of Morse's expenses associated with maintaining and developing customer relationships. For example, Kiva reimbursed Morse for $36,439 in travel, entertainment, and other business expenses in his final stub year of employment alone. App'x Ex. 2 (Hasenohrl Decl. ¶ 19, Ex. M). Every customer relationship and piece of customer knowledge that Morse developed until he left Kiva in October 2023 was paid for by Kiva and developed for Kiva's

benefit. *Id.*

**C. <u>Morse's Confidentiality and Non-Compete Agreement with Kiva</u>**

9. In April 2010, approximately one year after Kiva promoted Morse into his first sales role as the Pacific Northwest Territory Manager, Morse entered the Confidentiality Agreement with Kiva. *Id.* ¶ 20, Ex. N.

10. The details of the confidentiality, customer non-solicit, and non-compete provisions are not implicated by this Motion, but in summary, the Confidentiality Agreement contained: (1) a confidentiality agreement in its section 4 that prohibited Morse from using Kiva's confidential or proprietary information without Kiva's consent, and required Morse to return it to Kiva upon his termination; (2) a customer non-solicitation provision in its section 8 that prohibited Morse from soliciting Kiva's customers for a two-year period after his employment ended; and (3) a customer non-compete provision in its section 7 that prohibited Morse from working for a business that competed against Kiva in one of the territories in which he conducted business for Kiva for a two-year period after his employment ended. App'x Ex. 2 (Hasenohrl Decl. ¶ 21, Ex. O).

11. Morse's Confidentiality Agreement was never replaced or superseded by a subsequent agreement and remained in effect when he left Kiva. *Id.* ¶ 22.

**D. <u>Morse's Recruitment by Flashpoint and Departure from Kiva</u>**

12. Flashpoint hired Cody Jackson, Kiva's former Vice President of Supply, in January 2023, two months after his employment at Kiva ended. App'x Ex. 1 (McQuade Decl. ¶ 13, Ex. M).

13. Sometime between January 2023 and April 23, 2023, Morse had a meeting with Jackson and Flashpoint's CEO, Christopher Cox. *Id.* ¶ 14, Ex. N. Morse and Cox met again on April 23, 2023, and again on May 17, 2023. *Id.* Morse and Cox had a call on June 28, 2023, and on July 5, 2023, Morse emailed Cox stating that he reviewed a job description that Cox sent him, that he was very interested in it, and Morse sent Cox a detailed breakdown of his entire 2023 Kiva

compensation package. *Id.* ¶¶ 12, 15, Ex. L, O.

14. On July 20, 2023, Morse met with Cox, and by August 1, 2023, Morse and Cox were discussing whether Morse had a non-compete agreement with Kiva. *Id.* ¶¶ 15, 16, Ex. O, P. By September 6, 2023, Morse and Cox were negotiating the terms of Morse's offer letter, and Morse told Cox "I believe that once we get the legal protection side in place, we should be all good." *Id.* ¶ 17, Ex. Q. On October 6, 2023, Morse signed his offer letter with Flashpoint, and on October 11, 2023, he signed an agreement with Flashpoint whereby Flashpoint agreed to indemnify him for his legal expenses in connection with "litigation asserting violation of a non-compete provision." *Id.* ¶¶ 18, 19, Exs. R, S.

15. On October 13, 2023, Morse resigned from Kiva and misleadingly told Hasenohrl that he would be "doing work for Flashpoint" as a consultant in Oklahoma. App'x Ex. 2 (Hasenohrl Decl. ¶ 25).

16. Three weeks prior to Morse's resignation, Kiva held a multi-day annual sales team meeting in New Orleans on or about September 22–24, 2023. At the meeting, Kiva's sales team discussed Kiva's confidential future plans for areas of focus and expansion, and customer and supply strategies. *Id.* ¶ 26, Ex. P. Morse attended this meeting despite already having clear plans to leave Kiva and start working for Flashpoint less than a month later. App'x Ex. 1 (McQuade Decl. ¶ 17, Ex. Q).

### E. Morse's Use of Kiva's Confidential and Trade Secret Information to Solicit Kiva's Customers

17. On October 23, 2023, only ten days after Morse resigned from Kiva and told Hasenohrl that he would be "doing work for Flashpoint" as a consultant in Oklahoma, Morse texted Cox asking him to join a call with EnviroPro, a Kiva customer in California, about a "NorCal terminal opportunity." *Id.* ¶ 20, Ex. T.

18. Two days later, on October 25, 2023, Morse sent to Cox Kiva's confidential contact information for the owner of Tri-Flame Propane, another California Kiva customer, and the owner's son. *Id.* Morse also provided Cox Kiva's confidential knowledge about Tri-Flame Propane's management and structure to assist Flashpoint in soliciting them, writing the following to Cox: "Mike is the owner and Matt is his son … Matt runs the day to day in CA … They have a manager manage the affairs in NM … Mike is your best bet … But does not hurt to get some dialogue going with Matt for future CA sales." *Id.*

19. In subsequent months, Kiva's customers began reporting to members of Kiva's sales team that Morse was soliciting them to buy propane. App'x Ex. 2 (Hasenohrl Decl. ¶ 27, Ex. Q).

20. Morse's cellular phone records show that he made 89 calls to Kiva customers in his first month of employment at Flashpoint (October 20, 2023–November 20, 2023) and 1565 calls to Kiva customers in his first year of employment at Flashpoint (October 20, 2023–October 20, 2024). App'x Ex. 1 (McQuade Decl. ¶ 21, Ex. U).

21. Morse admitted in his Interrogatory Responses to soliciting at least 77 of Kiva's customers in the course of his employment at Flashpoint, and to selling 25,171,487 gallons of propane to 40 Kiva customers between October 2023 and February 2025. *Id.* ¶ 6, Ex. F.

**F. <u>Morse's and Flashpoint's Litigation Delay Tactics</u>**

22. Kiva filed the instant lawsuit on April 4, 2024. ECF No. 1.

23. Morse and Flashpoint attempted their first delay tactic in October 2024, which delayed discovery in this case by two months. Kiva served Requests for Production of Documents on Morse and Flashpoint on September 8, 2024. *Id.* ¶ 4, Exs. A-B. On October 4, 2024, just days before Morse's and Flashpoints' responses were due, Morse filed an untimely Partial Motion to Dismiss and a Joint Motion to Stay Discovery pending resolution of the Motion to Dismiss. ECF Nos. 38 & 39. The Court denied the Motion to Dismiss on December 6, 2024, and ordered the

Motion to Stay moot. ECF No. 58.

24. Morse and Flashpoint attempted their second delay tactic in December 2024, which delayed discovery by three months. In December 2024, Morse raised concern for the first time that he believed he did not sign the Confidentiality Agreement and his signature on the document was not authentic. ECF No. 67. Morse had never previously raised this issue despite Kiva having attached it to the Complaint eight months earlier and the parties having attended a case management conference with the court months earlier in which his counsel could have raised the issue. ECF Nos. 1, 35. Morse and Flashpoint jointly moved for a protective order to stay discovery until Morse's handwriting expert was able to analyze the authenticity of his signature on the Confidentiality Agreement. ECF No. 67. The Court denied Morse and Flashpoint's protective order on February 18, 2025. ECF No. 72. In the meantime, Kiva provided Morse's expert original copies of all documents that Morse requested for the analysis in January 2025, including the original copy of the Confidentiality Agreement. App'x Ex. 1 (McQuade Decl. ¶ 4). Morse's expert completed his analysis and returned the documents to Kiva in April 2025. *Id.* Kiva has heard nothing from Morse on the issue, and in the instant Motion, Morse admits to executing the Confidentiality Agreement, so Morse appears to have abandoned his earlier meritless position that he did not execute the Confidentiality Agreement.

25. Morse and Flashpoint launched their third delay tactic in April 2025, which delayed discovery by another three months. After the Court denied Morse and Flashpoint's protective order on February 18, 2025, all Parties met and conferred regarding discovery, and Morse and Flashpoint stated that they needed until April 16, 2025, to respond. *Id.* ¶ 5, Ex. C. Morse and Flashpoint served their responses and productions on April 16, 2025, but they were woefully deficient. *Id.* ¶ 6, Exs. D-F. The parties met and conferred on these deficiencies in April through June, and Morse and

Flashpoint finally agreed to supplement their productions months later on August 1, 2025, with Morse's text messages to Kiva customers whom he solicited for Flashpoint and Morse's responsive Flashpoint emails, which included Morse's emails with Kiva customers whom he solicited for Flashpoint.[2] *Id.*, Exs. G-H.

**G. <u>This Motion and Morse and Flashpoint's Subsequent Refusals to Produce Texts, Emails, and Witnesses for Deposition</u>**

26. This Motion is Morse's and Flashpoint's fourth and latest delay tactic. When August 1 arrived, neither Morse nor Flashpoint made the productions of Morse's text messages and emails that they had earlier promised. *Id.*, ¶ 7, Exs. G-H. Instead, Morse filed the instant Motion. Flashpoint subsequently attempted to join Morse's motion on August 8, 2025, but Kiva opposed Flashpoint's Joinder Request as improper under Local Rule 7-1(a)(8), and the Court denied Flashpoint's Joinder Request on August 15, 2025. ECF Nos. 91, 93, 95.01. Morse subsequently informed Kiva that he would not produce his text messages with Kiva customers to whom he admitted soliciting until this Motion is resolved, and that he would not appear for his deposition on September 12. App'x Ex. 1 (McQuade Decl., ¶ 7, Ex. G). Flashpoint similarly informed Kiva that despite the Court's denial of Flashpoint's Joinder, it would not produce Morse's emails with Kiva's customers to whom he admitted soliciting and would not make Jackson, Cox, and Flashpoint's corporate witness available for their August 6 and September 15, and 16 depositions until Morse's Motion is resolved. *Id.*, Ex. H.

**H. <u>Morse's and Flashpoint's Improperly Withheld Discovery Will Show That Morse Used Kiva's Trade Secrets to Solicit Kiva Customers for Flashpoint</u>**

27. Despite Morse admitting in his interrogatory responses to soliciting 77 Kiva customers and selling 25,171,487 gallons of propane to 40 of them between October 2023 and February 2025 on

---

[2] Kiva has filed motions to compel discovery against Morse and Flashpoint to address the unresolved deficiencies and they are currently pending. ECF Nos. 83 & 84.

behalf of Flashpoint, and despite Kiva having subpoenaed and produced Morse's cellular phone records showing that he called 1565 Kiva customers in his first year working for Flashpoint, Morse and Flashpoint refuse to produce Morse's text messages and emails with the solicited customers, and refuse to make any witnesses available for deposition. *Id.* ¶¶ 6-8, 21, Exs. D-H, U. Given the undisputed evidence of solicited customers, sales, and phone calls, numerous text messages and emails obviously exist between Morse and those Kiva customers, Kiva is entitled to these text messages and emails. *Id.* ¶ 8. They will show that Morse unlawfully used the following trade secret information to solicit Kiva customers, and more: Kiva's customer contact information, knowledge of those customers' communication, purchase volume, delivery, and deal structure preferences, knowledge of those customers' future business plans, and knowledge of those customers' price sensitivity, delivery costs, margins, and credit status. The deposition testimony of Morse's and Flashpoint's witnesses will further prove the same. *Id.*

## IV. LEGAL STANDARD

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Rost ex rel. K.C. v. Steamboat Springs RE-2 School Dist.*, 511 F.3d 1114, 1118-19 (10th Cir. 2008). The burden to prove the nonexistence of a genuine issue of material fact is on the moving party. *See Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). "When considering a motion for summary judgment, the court must not weigh evidence or assess credibility." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1022 (10th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Courts must "view the evidence and draw reasonable inferences there from in the light most favorable to the nonmoving party." *Schutz v. Thorne*, 415 F.3d 1128, 1132 (10th Cir. 2005). "If the evidence presented on a

dispositive issue is subject to conflicting, reasonable interpretations, summary judgment is improper." *SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1218 (10th Cir. 2009).

Defendant cannot show that there are no genuine issues of material facts or that he is entitled to judgment as a matter of law on Kiva's breach of contract, misappropriation of trade secrets in violation of the DTSA and UTSA claims.

## V. ARGUMENT

### A. Rule 56(d) Requires Denying Summary Judgment Because Morse and Flashpoint Refuse to Produce Key Discovery and Deposition Witnesses

Under Federal Rule of Civil Procedure 56(d), a court may defer or deny summary judgment, allow additional time for discovery, or issue any other appropriate order if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to summary judgment. The nonmovant's declaration should include "(1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable [the party] to obtain those facts and rebut the motion for summary judgment." *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1096 (10th Cir. 2010). "The central tenet of Rule [56(d)] is that 'summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition.'" *Burke v. Utah Transit Auth.*, 462 F.3d 1253, 1264 (10th Cir. 2006) (quoting *Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000)). Indeed, "[p]re-discovery motions for summary judgment are rarely granted and are disfavored." *Truman v. Johnson*, No. 2:17-CV-775-DAK-CMR, 2024 WL 3359467, at *1 (D. Utah July 8, 2024) (quoting *Patton v. General Signal Corp.*, 984 F. Supp. 666, 670 (W.D.N.Y. 1997)). Summary judgment "with no discovery is to be 'granted only in the clearest of cases' because of the importance of discovery for all parties." *See id.* Otherwise, a plaintiff

"should have an opportunity to depose [d]efendant prior to summary judgment," as defendant's deposition and documents are "important to [p]laintiff's ability to oppose summary judgment." *See id.*

Here, Kiva easily satisfies the four-factor test set forth in *Valley Forge Ins. Co.* to deny summary judgment under Rule 56(d). First, the Motion asks the Court to grant summary judgment on Kiva's DTSA and UTSA claims because it argues that Kiva failed to establish that Morse misappropriated Kiva's trade secrets. ECF No. 89, p. 12. While Kiva can already disprove this as detailed in section III(E) above based on the limited discovery Morse and Flashpoint have produced, Kiva anticipates discovering many more egregious examples of this unlawful conduct through the depositions of Morse, Flashpoint's Rule 30(b)(6) witness, Christoper Cox (Flashpoint's CEO), and Cody Jackson (Flashpoint's EVP of Operations), and through discovery of Morse's text messages and emails with Kiva customers. Furthermore, as detailed in section III(G) above, the aforementioned discovery that Morse and Flashpoint are improperly withholding will show that Morse unlawfully used the following trade secret information to solicit Kiva customers, and more: Kiva's customer contact information, knowledge of those customers' communication, purchase volume, delivery, and deal structure preferences, knowledge of those customers' future business plans, and knowledge of those customers' price sensitivity, delivery costs, margins, and credit status.

Second and third, Kiva cannot present to the Court Morse's text messages, emails with Flashpoint, and the deposition testimony of Morse, Flashpoint's Rule 30(b)(6) witness, and Cox because despite Kiva's discovery requests, meet-and-confer efforts, and pending discovery motions detailed in section III(F), Morse and Flashpoint have refused to produce this discovery ***until after*** the court rules on this Motion. App'x Ex. 1 (McQuade Decl. ¶¶ 6-7, Exs. G-H); ECF

Nos. 88, 90, 92. Denying this Motion will allow Kiva to receive this requested discovery and take the depositions it needs to fully defend this Motion.

Fourth, denial of this Motion will force Morse and Kiva to finally produce responsive text messages and emails, and to make Morse, Flashpoint's Rule 30(b)(6) witness, and Cox available for deposition. Accordingly, the court should deny Morse's Motion based on Rule 56(d).

### B. Summary Judgment on Kiva's Breach of Contract Claim Must Be Denied

Morse argues that Kiva's breach of contract claim should be dismissed because his employer changed from Kiva to Superior in connection with his promotion to Kiva's Director of Sales in November 2022, and the Confidentiality Agreement was either superseded by or incorporated into his 2022 promotion letter. ECF No. 89, pp. 7-8. Morse's argument fails because it is wrong on the facts and none of those contentions are correct. In truth, Kiva constantly remained Morse's employer after its March 2022 acquisition by Superior, and after Morse's November 2022 promotion to Kiva's Director of Sales. *Supra* Section II, Nos. 14-16. Additionally, Morse's 2022 promotion letter neither superseded nor incorporated the Confidentiality Agreement—nor did it need to for the Confidentiality Agreement to remain in effect and his controlling agreement with Kiva regarding confidentiality, customer non-solicitation, and non-competition, as detailed below. *Id.* Accordingly, summary judgment on Kiva's breach of contract claim should be denied.

#### 1. Kiva Always Employed Morse—Even After the 2022 Merger

Morse's employment with Kiva did not change when Superior acquired Kiva. Superior acquired Kiva in March 2022, but Kiva always remained Morse's employer. Superior never employed Morse, never employed Morse's supervisor Hasenohrl, and never employed any other Kiva employees. *Supra* section II, Nos. 15-16; section III(C); App'x Ex. 2 (Hasenohrl Decl. ¶¶ 23-24). This is evidenced by Morse's 2023 W2, which lists Kiva as Morse's employer, and by the fact

that Morse's supervisor Hasenohrl, who controlled the terms and conditions of Morse's employment and had the power to hire, fire, promote and discipline Morse, also remained a Kiva employee. App'x Ex. 2 (Hasenohrl Decl. ¶ 24), Ex. U; *Stamper v. Johnson*, 2010 UT 26, ¶ 20, 232 P.3d 514, 518 (quoting *Harry L. Young & Sons v. Ashton*, 538 P.2d 316, 318 (Utah 1975)) (A person is an employee if he is "hired and paid a salary, a wage, or at a fixed rate, to perform the employer's work as directed by the employer and who is subject to a comparatively high degree of control in performing those duties."). The use of Superior's offer letter template and references thereto in Morse's promotion letter was simply an administrative error when the letter was drafted. App'x Ex. 2 (Hasenohrl Decl. ¶ 24, Ex. V). Hasenohrl always represented to Morse that he remained a Kiva employee, Morse always represented himself to customers as a Kiva employee, the signature block on Morse's emails continued to state he was a Kiva employee, Morse's email address continued to have a "kivaunitedenergy.com" domain, and Morse never gave Hasenohrl any indication that he believed he was not a Kiva employee. *Id.* Accordingly, Kiva remained Morse's employer at all times and the Confidentiality Agreement remained in effect.

**2. <u>Morse's 2022 Promotion Letter Does Not Supersede His Confidentiality Agreement with Kiva</u>**

In addition to Kiva employing Morse at all times, Morse's 2022 promotion letter did not supersede the Confidentiality Agreement. A new agreement only supersedes a prior agreement where (1) the new agreement covers the exact same subject matter as the old agreement, and (2) the new agreement expressly states that it revokes, cancels, or supersedes the prior agreement. *Trugreen Companies, L.L.C. v. Scotts Lawn Serv.*, 508 F. Supp. 2d 937, 950 (D. Utah 2007) (finding recent agreements superseded prior agreements where "the new agreements appear[ed] to fully cover the subject areas addressed in the old agreements" and where "(1) there is an existing valid contract; (2) all parties agreed to a new contract; (3) the new contract extinguishes the prior

contract; and, (4) the new contract is valid." ); *see also One Call Locators, Ltd. v. CenturyTel Serv. Grp., LLC*, No. 16-CV-00844-CMA-KMT, 2017 WL 6017223, at *2 (D. Colo. Dec. 5, 2017) (holding a "subsequent contract not pertaining to 'precisely the same subject matter' will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels, or supersedes that specific prior contract").

Here, Morse's 2022 promotion letter does not cover the same subject matter as the Confidentiality Agreement, in fact, it is silent with respect to the treatment of Kiva's confidential information, solicitation of Kiva's customers, and competing against Kiva. App'x Ex. 2 (Hasenohrl Decl. ¶ 24, Ex. V). For that reason alone, the 2022 promotion letter cannot be held to supersede the Confidentiality Agreement. *See Trugreen*, 508 F. Supp. 2d at 950. But there is more, as Morse's 2022 promotion letter also does not state that it supersedes the Confidentiality Agreement. In fact, it states the opposite: "All other terms and conditions of your employment will remain unchanged." App'x Ex. 2 (Hasenohrl Decl. ¶ 24, Ex. V). For this additional reason, the 2022 promotion letter cannot be held to supersede the Confidentiality Agreement. Since none of the requirements for the 2022 promotion letter to supersede the Confidentiality Agreement are met, the Confidentiality Agreement remains Morse's controlling agreement with Kiva regarding confidentiality, customer non-solicitation, and non-competition, as detailed below.

### 3. Morse's 2022 Promotion Letter Does Not Incorporate the Confidentiality Agreement—Nor Does It Need to for the Confidentiality Agreement to Control

Morse's 2022 promotion letter also does not incorporate the Confidentiality Agreement. "Generally, for one contract to incorporate the terms of another, 'the reference must be clear and unequivocal.'" *See Jensen v. W. Jordan City*, 968 F.3d 1187, 1206–07 (10th Cir. 2020). Specific language is needed to "alert the non-drafting party that terms from another contract are being incorporated." *See Hous. Auth. of Cnty. of Salt Lake v. Snyder*, 2002 UT 28, ¶ 19, 44 P.3d 724,

729. And "it must be 'plainly shown that such was the intent of the parties; and this is usually where the later contract fully covers an earlier one.'" *See Trugreen*, 508 F. Supp. 2d at 950. Here, Morse argues—without citing any authority whatsoever—that the words "[a]ll other terms and conditions of your employment will remain unchanged" included in Morse's 2022 promotion letter somehow require that the Confidentiality Agreement is incorporated into the 2022 promotion letter. That argument fails because there is no clear and unequivocal language stating that the intent of the parties was to incorporate terms from the Confidentiality Agreement into the 2022 promotion letter. Because the Confidentiality Agreement was not incorporated, Utah Post-Employment Restrictions Act of 2016 is not implicated and is irrelevant here.

In summary, the 2022 promotion letter addresses completely different subjects than the Confidentiality Agreement. Accordingly, the 2022 promotion letter doesn't supersede or incorporate the Confidentiality Agreement. Instead, the 2022 promotion letter leaves the Confidentiality Agreement alone, which is all it needed to do for the Confidentiality Agreement to remain Morse's controlling agreement with Kiva regarding Confidentiality, customer non-solicitation, and non-competition. For that reason, summary judgment on Kiva's breach of contract claim should be denied.

**C. <u>Summary Judgment on Kiva's Trade Secret Claims Must Be Denied</u>**

The required elements to prove a claim for Trade Secret Misappropriation under the DTSA are: "(1) the existence of a trade secret that relates to a product or service used in, or intended for use in, interstate or foreign commerce; (2) the acquisition of the trade secret, or the use or disclosure of the trade secret without consent; and (3) the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1836; *See Total Quality Sys., Inc. v. Universal Synaptics Corp.*, 679 F. Supp. 3d 1196, 1210 (D. Utah 2023). The required elements to prove a claim under the DTSA are effectively the

same as the elements to prove a claim under the UTSA.[3] Here, even though discovery is not complete and Kiva and Flashpoint have refused to appear for depositions and have refused to produce key emails and text messages that are directly relevant to the elements of Kiva's DTSA and UTSA claims, Kiva can still identify sufficient evidence in the record to necessitate denial of Morse's Motion, as follows.

### 1. <u>Kiva's Confidential Customer Knowledge and Profitability Information Are Trade Secrets</u>

Courts consider the following factors when deciding whether information qualifies as a trade secret for purposes of the DTSA: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in its business; (3) the extent of measures taken by the business to guard the secrecy of its information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Hanks v. Anderson*, No. 2:19-CV-00999-DBB-JCB, 2024 WL 4092949, at *11 (D. Utah Sept. 5, 2024) (quoting *Bimbo Bakeries USA, Inc. v. Sycamore*, 29 F.4th 630, 641 (10th Cir. 2022)). Kiva's confidential knowledge of its customers and their patterns and preferences, and Kiva's confidential knowledge of its profitability and margins, which Morse and Flashpoint misappropriated, qualify as trade secrets under these factors, as set forth below.

[3] "The elements of a claim for trade secret misappropriation under the DTSA and UTSA closely resemble each other." *Total Quality Sys., Inc. v. Universal Synaptics Corp.*, 679 F. Supp. 3d 1196, 1210 (D. Utah 2023). The UTSA requires showing: "'(1) the existence of a trade secret, (2) communication of the trade secret to [the defendant] under an express or implied agreement limiting disclosure of the secret, and (3) [the defendant's] use of the secret that injures [the plaintiff].'" Utah Code Ann. § 13-24-1; *See Applied Predictive Techs., Inc. v. Marketdial*, Inc., No. 219CV00496JNPCMR, 2020 WL 6940736 (D. Utah Nov. 25, 2020).

**a) <u>Kiva's Confidential Customer Knowledge and Profitability Information Are Not Known Outside the Business and Could Not Be Easily Duplicated</u>**

Kiva satisfies the first and sixth factors of the *Bimbo Bakeries* test because its customer knowledge and profitability information is not known outside the business and could not be easily duplicated. As detailed in section III(A) above, Morse's assertion that Kiva's customer list is published in the NPGA's annual directory is incorrect. More than half of Kiva's customers (95 of 187) are not members of the NPGA and are not listed in the NPGA annual directory. App'x Ex. 1 (McQuade Decl. ¶ 10, Ex. J). To find those customers, a competitor would need to spend significant time and expense researching, cold-calling, and visiting businesses who may use bulk propane, and even then, some of Kiva's longtime customers would likely only be discovered by physically driving around looking for businesses with bulk propane storage tanks. App'x Ex. 2 (Hasenohrl Decl. ¶ 12). Even then, that would only identify customers, not their preferences, purchase patterns, and historical margin and profitability data, which Kiva carefully tracks, as that can only be established over many years of doing business with customers and carefully tracking sales data. *Id.*

**b) <u>Kiva's Confidential Customer Knowledge and Profitability Information Are Valuable to Kiva and Its Competitors</u>**

Kiva easily satisfies the fourth factor of the *Bimbo Bakeries* test. Over half of Kiva's customers not being NPGA members and not being easily identifiable is valuable to Kiva because it limits price sensitivity and allows for higher margins. *Id.* ¶ 7; *see also Hanks v. Anderson*, No. 2:19-CV-00999-DBB-JCB, 2024 WL 4092949, at *14 (D. Utah Sept. 5, 2024) (denying summary judgment and holding: "Contact lists gain value from secrecy because people are more likely to do business with an established contact in an industry than one of many businesses they are contacted by."). Kiva's knowledge of its customers' preferences regarding (1) method, frequency,

and time of communication, (2) time, method, and location of deliveries, (3) types of sales and contracts, such as market price, fixed price, fixed price with flexibility, tank lease, and automatic tank monitoring, and (4) customers' future plans allows Kiva to forecast what its customers want and allows Kiva to give them the highest level of service so that they remain loyal to Kiva. App'x Ex. 2 (Hasenohrl Decl. ¶ 9). Kiva's knowledge of purchase patterns, such as times of year when they demand more and less propane, and knowledge of customer price sensitivity allows Kiva to forecast the demands on its propane supply and engage in strategic supply strategies to optimize its pricing and margins to maximize its profitability and value to its customers. *Id.* Kiva's historical margin and profitability data on sales to customers is valuable to Kiva in making future plans regarding where to expand its operations, where to shrink, and where to focus its resources to maximize profitability and customer value. *Id.* ¶ 11.

The above knowledge is valuable to competitors like Flashpoint because it would allow them to usurp Kiva's strategies to maximize customer service and profitability without having to spend the time and money that Kiva spent developing the knowledge. *Id.* ¶ 12. Armed with knowledge of Kiva's profit margins, competitors would know where they needed to set their prices to outbid Kiva while maximizing their profitability. *Id.*

**c) <u>Kiva Has Spent Decades and Millions of Dollars Developing Its Confidential Customer Knowledge and Profitability Information</u>**

Kiva satisfies the fifth factor of the *Bimbo Bakeries* test because it has spent two decades and millions of dollars in employee salaries and business expenses developing its confidential knowledge of its customers and their patterns and preferences. *Id.* ¶ 9; *Hanks v. Anderson*, No. 2:19-CV-00999-DBB-JCB, 2024 WL 4092949, at *12 (D. Utah Sept. 5, 2024) (summary judgment is inappropriate where plaintiff's "client list was developed over decades, through the investment of a substantial amount of time and effort"). As detailed in section III(A) above, Kiva's sales team

has developed this customer knowledge by visiting current and potential customers and taking them to breakfast, lunch, dinner, coffee and events, by calling, texting, and emailing customers, by providing swag and gifts to customers, by sponsoring customer events and charities, and by attending and sponsoring national and regional trade association meetings and events each year. App'x Ex. 2 (Hasenohrl Decl. ¶ 10). On average, Kiva spends $60,000 to $100,000 per sales team member reimbursing them for the aforementioned business expenses each year. *Id.* Kiva's sales team tracks this information by preparing confidential reports that summarize their interactions with customers. *Id.*, Exs. A-C. Kiva's sales team also carefully tracks its profit margins, pricing, and sales volumes on all transactions and compiles them into reports that Kiva uses in making business decisions. *Id.* ¶ 11, Exs. D-K.

#### d) **Kiva Protects Its Confidential Customer Knowledge and Profitability Information**

Kiva satisfies the second and third factors of the *Bimbo Bakeries* test because as detailed in section III(A) above, it protects its customer knowledge and profitability information by requiring employees who access it to sign confidentiality and non-compete agreements, by training employees on handling confidential information in its employee handbook, by storing them on the company's password-protected servers, and by limiting their distribution within the company to its sales, supply, and accounting teams. App'x Ex. 2 (Hasenohrl Decl. ¶ 14, Exs. S-T); *e.g. Hanks v. Anderson*, No. 2:19-CV-00999-DBB-JCB, 2024 WL 4092949, at *12 (D. Utah Sept. 5, 2024) (summary judgment not appropriate where plaintiff protected its client list by limiting access, requiring unique user and password information to access their servers, and by relying on a confidentiality provision); *MSC Safety Sols., LLC v. Trivent Safety Consulting, LLC*, No. 19-CV-00938-MEH, 2019 WL 5189004, at *6 (D. Colo. Oct. 15, 2019) (plaintiff adequately pled the existence of trade secrets under the DTSA where it took "reasonable measures to keep its

confidential information secret," including "firewalls, antivirus software, password protection, and physical safeguards"); *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1113 (10th Cir. 2009) ("There always are more security precautions that can be taken. Just because there is something else that [the owner] could have done does not mean that their efforts were unreasonable under the circumstances.").

**e) <u>Numerous Courts in the Tenth Circuit Have Held That the Types of Information Kiva Seeks to Protect Are Trade Secrets</u>**

Numerous courts in the Tenth Circuit Court of Appeals, the District of Utah, and Utah state court have held that the types of information set forth in section III(A) above that Kiva seeks to protect here can be trade secrets for purposes of the DTSA. *See, e.g., Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1189 (10th Cir. 2009) ("As a general matter, '[c]onfidential data regarding operating and pricing policies can . . . qualify as trade secrets.'"); *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1113–14 (10th Cir. 2009) ("A customer list can be a trade secret when it is the end result of a long process of culling the relevant information from lengthy and diverse sources, even if the original sources are publicly available."); *Hammerton, Inc. v. Heisterman*, No. 2:06-CV-00806 TS, 2008 WL 2004327, at *8 (D. Utah May 9, 2008) (denying summary judgment on a trade secret claim because customer lists constitute trade secrets "where the customers are not known in the trade or are discoverable only by extraordinary efforts"); *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 50, 372 P.3d 629, 650 (a jury could have found that "technical information about the size, location, configuration, economics, engineering, and assets" and "business strategies, goals, and plans, including proformas describing cost and profitability" were trade secrets); *InnoSys, Inc. v. Mercer*, 2015 UT 80, ¶¶ 24-25, 364 P.3d 1013, 1018 (reversing summary judgment for defendant on appeal where plaintiff employer "arguably established . . . the existence of protectable trade secrets in its business plan and other confidential information" under

the "undisputed facts" of the case).

### 2. **<u>Morse Acquired Kiva's Customer Knowledge and Profitability Information Through His Employment at Kiva and Took It When He Left</u>**

As detailed in Section III(B) above, Morse received, used, and contributed to Kiva's customer knowledge and profitability information in the course of his employment on Kiva's sales team. For example, as a territory manager, he visited customers on business trips, prepared trip reports, tracked delivery costs and margins on bids he quoted to customers. App'x Ex. 2 (Hasenohrl Decl. ¶ 18, Ex. A). Later as Kiva's Sales Director, Morse regularly received and commented on trip reports prepared by territory managers, accompanied territory managers on business trips, and received reports showing all of Kiva's sales, prices, and margins. *Id.*, Exs. B-K. He also received training on Kiva's new offerings (*id.*, Exs. L, R) and attended internal sales strategy meetings, including an annual meeting only a month before leaving to work for Flashpoint. *Id.* ¶ 26, Ex. P.

When Morse left Kiva, he took Kiva's customer knowledge and profitability information with him. Morse physically took some of this information, such as the contact list on his cell phone. *E.g. Calence, LLC v. Dimension Data Holdings*, No. C06-0262RSM, 2007 WL 1526349, at *3 (W.D. Wash. May 23, 2007) (denying MSJ on a UTSA claim where defendant retained "customer contact lists and e-mails" on his "Blackberry device"). Morse took other information using his memory. *E.g. Edwards Lifesciences LLC v. Thompson*, No. 24-CV-02558-RMR-KAS, 2025 WL 2045423, at *15 (D. Colo. June 18, 2025) (defendant's "knowledge of customer preferences may constitute a trade secret" despite not having any physical documents); *Wisk Aero LLC v. Archer Aviation Inc.*, No. 3:21-CV-02450-WHO, 2021 WL 8820180, at *24 (N.D. Cal. Aug. 24, 2021) (finding "trade secrets can exist in employees' memories; a trade-secret plaintiff does not need to show that an actual document was taken"). With depositions and additional discovery, Kiva will confirm additional trade secret information that Morse took, highlighting the premature nature of

the Motion and that it should be denied.

**3. <u>Morse Knowingly and Unlawfully Used Kiva's Trade Secrets to Benefit Flashpoint and Himself</u>**

Even though Morse and Flashpoint have refused to attend depositions and have refused to produce text messages and emails exchanged between Morse and the Kiva customers to whom he admitted selling propane, Kiva can still identify many instances of Morse using Kiva's customer knowledge and profitability information to benefit Flashpoint and himself. For example, as detailed in section III(E) above, on October 23, 2023, only ten days after Morse resigned from Kiva and told Hasenohrl that he would be "doing work for Flashpoint" as a consultant in Oklahoma, Morse texted Cox asking him to join a call with EnviroPro, a Kiva customer in California, about a "NorCal terminal opportunity." App'x Ex. 1 (McQuade Decl. ¶ 20, Ex. T). Two days later, on October 25, 2023, Morse sent Cox Kiva's confidential contact information for the owner's son of Tri-Flame Propane, another California Kiva customer, and provided Cox Kiva's confidential knowledge about Tri-Flame Propane's management and structure, writing the following to Cox: "Mike is the owner and Matt is his son … Matt runs the day to day in CA … They have a manager manage the affairs in NM … Mike is your best bet … But does not hurt to get some dialogue going with Matt for future CA sales." *Id.* The only source where Morse could have gotten that information is Kiva, and Kiva's deposition of Morse will confirm that, and much more.

Morse's cellular phone records show that he made 89 calls to Kiva customers in his first month of employment at Flashpoint (October 20, 2023–November 20, 2023) and 1565 calls to Kiva customers in his first year of employment at Flashpoint (October 20, 2023–October 20, 2024). *Id.* ¶ 21, Ex. U. Morse admitted in his Interrogatory Responses to soliciting at least 77 of Kiva's customers in the course of his employment at Flashpoint and to selling approximately 25,171,487

gallons of propane to approximately 40 Kiva customers between October 2023 and February 2025. *Id.* ¶ 6, Ex. F. Kiva's customers also started reporting to Kiva's sales managers shortly after Morse left that he was contacting them on behalf of Kiva. *Id.* ¶ 9, Ex. I; App'x Ex. 2 (Hasenohrl Decl. ¶ 27, Ex. Q). Morse obviously took the contact information and inside customer knowledge for customers from Kiva and used it to solicit and make the sales. Kiva's deposition of Morse will confirm that as well.

**4. The Doctrine of Inevitable Disclosure Applies Here**

"The doctrine of inevitable disclosure is based upon the notion that sometimes a departing employee may have such extensive knowledge of and experience with the former employer's trade secrets that, given the employee's new job function, it is inevitable that he will use or encroach upon the former employer's trade secrets." *Novell Inc. v. Timpanogos Rsch. Grp. Inc.*, No. 970400339, 1998 WL 177721, at *26-27 (Utah Dist. Ct. Jan. 30, 1998). Here, Morse's job functions at Kiva included selling propane in California and the Pacific Northwest. App'x Ex. 2 (Hasenohrl Decl. ¶¶ 16-17). Morse has admitted that at Flashpoint he is selling propane in California and the Pacific Northwest. App'x Ex. 1 (McQuade Decl. ¶ 6, Ex. F). Since Morse is performing the same job, in the same territories, that benefits from the same information, Morse's use of Kiva's customer knowledge and profitability information to benefit Flashpoint and himself is inevitable.

**D. Discovery Should Not Be Stayed**

Morse's argument that Discovery should be stayed misrepresents legal authority and the facts, and it highlights the reality that the purpose of this Motion is to delay.

Morse argues that discovery should not proceed because Kiva has not adequately pled its trade secrets. The argument is wrong on the law because the Utah Supreme Court and Utah Federal District Courts have confirmed, that "there is no 'particularity' requirement" under the UTSA, and

"the UTSA does not contain a particularity requirement at any stage of litigation." *Surgenex, LLC v. Predictive Therapeutics, LLC*, 462 F. Supp. 3d 1160, 1171 (D. Utah 2020) (citing *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 48, 372 P.3d 629). Accordingly, "a plaintiff is not required to identify its trade secret with particularity before discovery may be had on the issue." *Quest Sol., Inc. v. RedLPR, LLC*, No. 2:19-CV-437-CW-DBP, 2021 WL 1688644, at *2 (D. Utah Apr. 28, 2021) (citing *USA Power, LLC*, 2016 UT 20, ¶ 47). The DTSA's pleading requirements are the same. The argument is wrong on the facts because as detailed in section III(A) herein, Kiva has identified its trade secrets and produced examples of them, and discovery on Kiva's breach of contract claims and trade secret claims overlap.

Morse argues that Kiva's discovery requests are an overbroad fishing expedition—that is simply not true. As a preliminary matter, Morse and Flashpoint refuse to appear for their noticed depositions. App'x Ex. 1 (McQuade Decl. ¶ 7, Exs. G-H). That refusal is inexcusable and separate from any objections Morse may have to Kiva's requests for production. Additionally, Kiva's requests for production of Morse's text messages and emails with the 77 Kiva customers to whom Morse has admitted in written discovery to soliciting go to the very heart of this case. They also are not burdensome. With the use of standard discovery tools, Morse and Flashpoint can easily collect and produce the data, just as Kiva collected and produced emails from its own custodians in response to Morse and Flashpoint's requests.

Finally, a stay requires a "strong showing of necessity[,]" and "if even a fair possibility exists that the stay would damage another party, the movant must demonstrate a clear case of hardship or inequity." *Classic Aviation Hldgs LLC v. Harrower*, No. 220CV00824RJSJCB, 2021 WL 633587, at *2 (D. Utah Feb. 18, 2021). Here, Morse has made no showing of necessity. On the other hand, Kiva will be clearly prejudiced by a discovery stay because the longer discovery is

postponed, the longer this case will drag on, allowing Defendants to continue unlawfully using Kiva's trade secret information and soliciting and selling to Kiva's customers.

## VI. CONCLUSION

For the foregoing reasons, Kiva Requests that Morse's Motion for Summary Judgment and to Stay Discovery be denied.

DATED this 12th day of September 2025.

*/s/ James H. McQuade*

ORRICK, HERRINGTON & SUTCLIFFE LLP
Katie E. Briscoe (*pro hac vice*)
Frank N. Zalom (*pro hac vice*)
400 Capitol Mall, Suite 3000
Sacramento, CA 95814
Telephone: (916) 447-9200
kbriscoe@orrick.com
fzalom@orrick.com

ORRICK, HERRINGTON & SUTCLIFFE LLP
Ryan C. Wooten (*pro hac vice*)
609 Main Street, 40th Floor
Houston, TX 77002
Telephone: (713) 658-6400
rwooten@orrick.com

ORRICK, HERRINGTON & SUTCLIFFE LLP
James McQuade (*pro hac vice*)
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-5198
jmcquade@orrick.com

RAY QUINNEY & NEBEKER P.C.
Liesel Stevens (UT SBN 10431)
36 South State Street, Suite 1400
Salt Lake City, UT 84111
Telephone: (801) 323-3304
lstevens@rqn.com

*Attorneys for Kiva United Energy, Inc.*